Filed 4/15/25  P. v. Juarez CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUAN JUAREZ,<br><br>    Defendant and Appellant. | 2d Crim. No. B334480<br>(Super. Ct. No. 1501002)<br>(Santa Barbara County) |

Juan Juarez appeals an order denying his motion to vacate his 2016 conviction for making criminal threats (Pen. Code,[1] § 422) with weapon and gang enhancements (§§ 12022, subd. (b), 186.22, subd. (b)).  He contends he was not properly advised of the mandatory deportation consequences of his no contest plea. (§ 1473.7.)  We conclude otherwise and affirm.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

FACTS

On April 5, 2016, two men were listening to music in their car. Juarez and Angel Ramirez drove by, stopped, got out of the car, and yelled, "You're disrespecting our hood" and "West Park." The victims got out of their car and attempted to explain that they were only listening to music. Ramirez assaulted one of them with a "large glass bong." The victims retreated to their car. Juarez punched one of them in the head. As they drove away, Juarez and Ramirez yelled, "We will get you later."

Juarez and Ramirez followed them. They continued the confrontation and Juarez pushed one of the men. A neighbor, John Sahagun, "attempted to intervene." Juarez responded by "brandishing a knife." A girlfriend of one of the victims came out and said she was going to call the police. As Juarez and Ramirez left, they said, "You're going to call the police, we will just get you later," and said they would bring more "homies to come back later."

In 2015, Juarez and two other West Park gang members met an undercover agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and discussed selling the agent methamphetamine. Juarez obtained methamphetamine and went to the "buy location."

Juarez was arrested and charged with a violation of Health and Safety Code section 11379, "with a gang allegation per [section] 186.22(b)." The two victims, Sahagun and another witness testified at the preliminary hearing. The People filed an information charging Juarez with felony dissuading a witness by threat (§ 136.1, subd. (c)) (count 1); felony criminal threats (§ 422) (count 2); felony assault with a deadly weapon (§ 245, subd. (a)(1)) (count 3); felony transportation or sale of

2

methamphetamine (Health & Saf. Code, § 11379) (count 4); and misdemeanor vandalism (§ 594, subd. (b)(2)(A)) (count 5).

The People alleged that counts 1 through 4 were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(4)(C)), and that Juarez used a knife to commit counts 1 and 2. (§ 12022, subd. (b).)

In 2016, Juarez entered into a negotiated plea agreement. He was 26 years old and had a criminal history dating back to when he was 15 years old. He had two prior "domestic violence convictions" and had violated probation by "failing to enroll in a batterer's intervention program." Juarez pled no contest to count 2, felony criminal threats, admitted the gang allegation and that he personally used a deadly weapon.

The plea agreement signed by Juarez and his counsel contained an advisement providing, among other things, "I understand that if I am not a citizen of the United States, my plea of guilty or no contest may or, with certain offenses, **will** result in my deportation . . . ."

Before Juarez entered his plea, the prosecutor asked, "[D]o you understand that if you are not a citizen of the United States, by pleading in this case it *will result in your deportation*, exclusion from admission or readmission to the United States, and a denial of naturalization and citizenship?" (Italics added.) Juarez responded: "Yes."

In 2023, Juarez filed a motion to vacate his 2016 conviction pursuant to section 1473.7. He claimed, among other things, that he was not properly advised that the immigration consequences of his plea would lead to his deportation. The People filed an opposition.

3

At an evidentiary hearing Juarez testified that his counsel failed to advise him that his plea involved an aggravated felony that would lead to his deportation. He was not interested in the sentence he would receive; his only concern was "avoiding immigration consequences." He did not remember being questioned by the prosecutor about the immigration consequences. His trial counsel declared that she warned him he would likely be deported, have his legal status revoked, and be barred from admission into the United States.

The trial court denied the motion. It found, among other things, that Juarez's "testimony at the hearing lacked credibility," and that the prosecutor gave an "unequivocal warning" before Juarez entered his plea that his plea "will result in [his] deportation." The court rejected the testimony of an attorney who specializes in immigration who claimed Juarez's trial counsel did not properly advise him of the deportation consequences.

## DISCUSSION

### Section 1473.7

"[S]ection 1473.7 allows noncitizens who have served their sentences to vacate a conviction if they can establish by a preponderance of the evidence that their conviction is 'legally invalid due to prejudicial error damaging [their] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence.'" (*People v. Espinoza* (2023) 14 Cal.5th 311, 316.) "To establish prejudicial error, a defendant must demonstrate a 'reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences.'" (*Ibid.*)

4

" ' "[U]nder independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law." ' " (*People v. Espinoza, supra*, 14 Cal.5th at pp. 319-320.) "When courts engage in independent review, they must give deference to the trial court's factual determinations if they are based on ' " 'the credibility of witnesses the [superior court] heard and observed.' " ' " (*Ibid.*) "To determine whether there is a reasonable probability a defendant would have rejected a plea offer if he had understood its immigration consequences, courts must 'consider the totality of the circumstances.' " (*Id.* at p. 320.) " 'Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible.' " (*Ibid.*) "Also relevant are the defendant's probability of obtaining a more favorable outcome if he had rejected the plea, as well as the difference between the bargained-for term and the likely term if he were convicted at trial." (*Ibid.*)

The defendant must produce "objective evidence" such as the "contemporaneous documentation" to support his "factual assertions." (*People v. Espinoza, supra*, 14 Cal.5th at p. 321.)

*Immigration Consequences Advisements*

The immigration consequences on Juarez's plea form provided, "I understand that if I am not a citizen of the United States, my plea of guilty or no contest may or, with certain offenses, **will** *result in my deportation, exclusion from reentry* to the United States, and denial of naturalization and amnesty and that the appropriate consulate may be informed of my conviction.

The offenses that will result in such immigration action include, but are not limited to, *an aggravated felony*, conspiracy, a controlled substance offense, a firearm offense, and under certain circumstances, a moral turpitude offense." (Italics added.)

Juarez contends he did not understand that his no contest plea to a criminal threats offense was an aggravated felony that would lead to his mandatory deportation. But before he entered his plea, the prosecutor asked Juarez, "[D]o you understand that if you are not a citizen of the United States, *by pleading in this case it will result in your deportation . . . ?*" (Italics added.) Juarez responded, "Yes."

During the pre-plea advisements, the trial court asked Juarez, "You understand the consequences of your plea today?" Juarez responded, "Yes." The court asked, "Do you have any questions, sir?" Juarez said, "No." The prosecutor asked Juarez, "Do you have any questions for your attorney in private at this time? Juarez said, "No." The court found Juarez "understands" the "consequences of the plea."

The prosecutor advised Juarez of the mandatory consequences. (*People v. Perez* (2018) 19 Cal.App.5th 818, 830.) Juarez had no questions for the prosecutor, the court, or his counsel. The trial court that decided his motion found he and his counsel "had a chance to pause the proceedings if they disagreed with the prosecutor," and Juarez "did not ask his lawyer what the immigration consequences would be."

Juarez suggests these official advisements were irrelevant because only what his counsel advised him is important. But his counsel also signed the plea form and Juarez may not "ignore the admonitions." (*People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 663.) These advisements are part of the " 'totality of

6

circumstances' " (*People v. Espinoza*, *supra*, 14 Cal.5th at p. 320); they show what he knew (*People v. Perez*, *supra*, 19 Cal.App.5th at p. 830) and are contemporaneous evidence.  Plea colloquy warnings may show whether the defendant suffered prejudice (*Lee v. United States* (2017) 582 U.S. 357, 369, fn. 4 [198 L.Ed.2d 476, 488, fn. 4]), and his in-court statements carry a "strong presumption of verity."  (*Blackledge v. Allison* (1977) 431 U.S. 63, 74 [52 L.Ed.2d 136, 147].)

*Counsel's Duty*

Juarez contends his defense counsel did not advise him of the deportation consequences of his plea.

In *Padilla v. Kentucky* (2010) 559 U.S. 356, 374 [176 L.Ed.2d 284, 299], the United States Supreme Court held in cases such as the present one, "counsel must inform [the] client whether the plea carries *a risk of deportation.*"  (Italics added.) "[W]hen the deportation consequence is truly clear, . . . the duty to give correct advice is equally clear."  (*Id.* at p. 369 [176 L.Ed.2d 284, 296].)

Here Juarez's counsel noted the risk of deportation and then advised him that entering the plea "*would likely result in deportation.*"  (Italics added.)

Juarez suggests counsel had to state that deportation was automatic to be effective advice.  But courts following *Padilla* have held advising the defendant that deportation is "likely" or "very likely" is a sufficient advisement about the deportation consequences that complies with *Padilla.*  (*United States v. Armendariz* (5th Cir. 2023) 80 F.4th 546, 552-554; *United States v. Ramirez-Jimenez* (8th Cir. 2018) 907 F.3d 1091, 1094; *United States v. Cazarez-Santos* (S.D.Cal. 2014) 66 F.Supp.3d 1301, 1310; *People v. Juarez* (Colo. 2017) 459 P.3d 596, 604; *State v.*

7

*Sanmartin Prado* (Md.Ct.App. 2016) 141 A.3d 99, 130; *State v. Shata* (Wis. 2015) 868 N.W.2d 93, 113; *Chacon v. State* (Mo.Ct.App. 2013) 404 S.W.3d 529, 537; *Commonwealth v. Escobar* (Pa. 2013) 70 A.3d 838, 842.) Moreover, his counsel's advisement, *coupled* with the immigration advisement on his plea form, and the prosecutor's advisement gave Juarez ample warning that his plea included a deportable offense.

To show counsel's advisement was inadequate, Juarez must prove that 1) he "did not meaningfully understand the immigration consequences"; and 2) his "misunderstanding constituted prejudicial error," which means there was " 'a reasonable probability' " that he " 'would have rejected the plea if [he] had correctly understood its actual or potential immigration consequences.' " (*People v. Espinoza*, *supra*, 14 Cal.5th at p. 319.)

### Juarez's Credibility as a Witness

Juarez contends that had his attorney advised him that his conviction involved an aggravated felony, he would not have made that plea. He testified that at the time of his plea he had a mistaken view of the law by believing that if he could avoid a drug trafficking conviction, this would prevent a deportation.

But the trial court found Juarez was not credible. We must give deference to that finding. (*People v. Espinoza*, *supra*, 14 Cal.5th at pp. 319-320.) Juarez testified that he did not remember the prosecutor's advisements. But the transcript of the 2016 hearing shows the advisements. He testified he was *only* concerned about the immigration consequences. But he also testified that he had *no discussions* with his counsel about immigration consequences. This conflicted with his declaration where he declared, "My defense attorney told me that I could have problems with immigration because of my charges." It also

8

conflicted with his defense counsel's declaration. These "[i]nconsistencies in testimony" present "questions of credibility" for the trial court. (*People v. Lopez* (2018) 5 Cal.5th 339, 352.)

*Ties to the United States*

In *Espinoza*, the court ruled the defendant's ties "to his family" support "the conclusion that immigration concerns would have been paramount to him at the time of his plea." (*People v. Espinoza, supra*, 14 Cal.5th at p. 325.) Here, by contrast, the trial court found "[n]ot a single relative provided a declaration or testified at the hearing to support [Juarez's] ties to the United States." Juarez declared that "his parents are in poor health," but he provided no evidence that he has ever helped them. He "did not present a work history, pay stubs, or a letter of support from any employer." The trial court found his "ties to the United States are weakened by his criminal history, separation from his family, and domestic violence."

Juarez had been convicted of "spousal battery" and had violated his probation by "failing to enroll in a batterer's intervention program." He had "two domestic violence convictions." He had been living separate from his wife and child since 2014.

Juarez contends the trial court's order conflicts with *People v. Vivar* (2021) 11 Cal.5th 510 because it did not accept his statements about his ties and his family in his declaration.

*Vivar* held that under independent review, " '[t]he trial court and this court are in the same position in interpreting *written declarations*.' " (*People v. Vivar, supra*, 11 Cal.5th at p. 528, italics added.) But Juarez *testified at the hearing*. In *Vivar*, the court held that "factual determinations that are based on ' "the credibility of witnesses the [superior court] *heard and*

9

*observed*" ' are entitled to *particular deference*." (*Id.* at p. 527, italics added.) Because the court found Juarez was not a credible witness, it could find his declaration he authored was not credible.

*Probability of Obtaining a More Favorable Outcome*

"[T]he defendant's probability of obtaining a more favorable outcome if he rejected the plea, as well as the difference between the bargained-for term and the likely term if he were convicted at trial," are relevant. (*People v. Espinoza, supra*, 14 Cal.5th at p. 320.) But these factors do not favor Juarez. The "attorney's statement" on the plea form showed 1) Juarez's counsel said there was a "factual basis" for the plea based on the preliminary hearing transcript; 2) his counsel concurred "in the plea," discussed any possible defense, and "answered all of [his] questions." The People noted that if convicted on all counts, he faced a possible sentence of "seven years to life in state prison."

The trial court found his bargained-for plea was favorable. The "bargained-for term of 4 years and the possible term of life in prison, if convicted at trial, is significant," and the "disparity explains why [Juarez] accepted an immigration-unsafe plea." His trial counsel declared, "[T]he ultimate offer was as good as he was going to get from an immigration standpoint."

Juarez's claim that the prosecutor would have accepted a more favorable plea is undermined by: 1) his commission of a strike offense for the benefit of a street gang, 2) the preliminary hearing eyewitness testimony, 3) his criminal record which included violent offenses, 4) his poor performance on probation, and 5) his defense counsel's declaration showing the plea deal "was as good as he was going to get."

10

*Availability of an Alternative Immigration-Safe Plea*

The trial court may consider whether the defendant "had reason to believe an immigration-neutral negotiated disposition was possible." (*People v. Espinoza*, *supra*, 14 Cal.5th at p. 320.) The court found the declaration of Juarez's trial counsel showed such an "immigration-safe plea" was not possible, and it was not "a reasonable option" given his criminal history and "the aggravated nature of this case." Juarez had a significant criminal record. His trial counsel declared that at the time of his plea she did not believe there was a "safe option" for immigration consequences given his charges.

Juarez notes that his immigration expert testified there was an immigration-safe alternative plea and with it he would not receive a higher sentence than the one he received. He claims the trial court erred by rejecting this testimony. But the credibility of that witness was decided by the trial court (*People v. Espinoza*, *supra*, 14 Cal.5th at p. 325), and it found she gave opinions not supported by foundational facts.

Moreover, Juarez "presents no evidence that he ever participated in contemporaneous discussions or negotiations for immigration-neutral charges with the People." (*People v. Bravo* (2021) 69 Cal.App.5th 1063, 1074.) He did not show "the *prosecution was willing* to agree to an immigration safe disposition." (*People v. Perez*, *supra*, 19 Cal.App.5th at p. 830.) In their opposition, the prosecution noted reasons why the alternative plea would not be acceptable to the People. These included: 1) that the "alternative charges differ significantly in seriousness from those to which the Defendant pled"; 2) such an alternative could not be expected to have been "accepted by the People under the facts of this case"; and 3) the People wanted the

11

admission to the particular crime of violence as part of a plea. A defendant cannot "show a 'reasonable probability' of a different result based on a purely hypothetical plea offer subject to absolute executive discretion." (*Lee v. United States*, *supra*, 582 U.S. at p. 369, fn. 4 [198 L.Ed.2d 476, 488, fn. 4].) The trial court also found Juarez's testimony that he would have accepted a plea deal that involved more prison time in exchange for an immigration-neutral deal was not credible.

*The Criminal Record and Other Issues*

"[A] defendant without an extensive criminal record may persuasively contend that the prosecutor might have been willing to offer an alternative plea without immigration consequences." (*People v. Espinoza*, *supra*, 14 Cal.5th at p. 324.) But Juarez's criminal record included crimes of violence and probation violations. The trial court also found "the severity of punishment was more important to [Juarez] than immigration." Juarez "focused on the disparity of punishment proposed between himself" and his codefendant, and rejected plea proposals "based on the length of the sentence." He testified he was not interested in the sentence he would receive; he was *only* concerned with "avoiding immigration consequences." But later he testified he was concerned that his codefendant only received a three-month sentence, and Juarez admitted he rejected a nine-year sentence offer because it was unfair. Juarez's remaining contentions do not support grounds for reversal.

Juarez claims *People v. Padron* (2025) 109 Cal.App.5th 950 requires that we use our independent review to reverse. We disagree. In *Padron*, the defendant did not testify. He filed written declarations. The Court of Appeal using its independent review held the declarations supported the motion to vacate

12

under section 1473.7.  Here, by contrast, Juarez testified to support his motion.  Because the trial court found his testimony was not credible, that finding undermines the factual basis needed to support his motion.

## DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED.

GILBERT, P. J.

We concur:

YEGAN, J.

BALTODANO, J.

13

Stephen F. Foley, Judge

Superior Court County of Santa Barbara

_____

Christopher Lionel Haberman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle, Steven D. Matthews and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.