Filed 11/22/21 (first mod. order & unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CARLOS ARGENIS FIGUEROA ALATORRE,<br><br>    Defendant and Appellant. | D077894<br>(Imperial County Super. Ct. No. JCF18829)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

Respondent's second petition for rehearing, received on November 18, 2021 (Petition), is deemed to include a request to file a late petition, which is granted. (Cal. Rules of Court, rules 8.366(a), 8.268(b)(1)(A) & (b)(4).) The Petition is deemed filed as of the date of this order.

It is ordered that the opinion filed October 22, 2021 and modified November 16, 2021, be modified as follows:

1. On page 31 of footnote 31, last sentence of the first full paragraph, the words "They cannot be read to authorize" is changed to "On this record, they do not authorize" so the sentence reads:

On this record, they do not authorize *the prosecution* to elicit testimony from Alatorre's former attorneys in violation of the attorney-client privilege.

2.   On page 31 of footnote 31, at the end of the last paragraph ending with the words "an attorney charged with professional wrongdoing," add the following sentence:

We express no opinion on whether former defense counsel might properly offer admissible testimony in a section 1473.7 hearing for different purposes or under different circumstances.

The Petition is DENIED.

There is no change in judgment.

HUFFMAN, Acting P. J.

Copy:  All parties

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>CARLOS ARGENIS FIGUEROA ALATORRE,<br><br>        Defendant and Appellant. | D077894<br>(Imperial County Super. Ct. No. JCF18829)<br><br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed October 22, 2021 be modified as follows:

1. On page 28, the paragraph of footnote 30 is modified to read as follows:

> 30  Alatorre's plea form only indicated that the plea "*could* result in my being deported."  Counsel told the court at the hearing that there was no longer a transcript of the plea proceedings from 2008.  Alatorre submitted a declaration stating he was never advised by his counsel "that a conviction for the crime(s) charged could directly result in my deportation, exclusion, and denial of naturalization of citizenship from the United States, my home."  Two lawyers involved in his representation were subpoenaed by

the People for the hearing but were released without testifying, presumably because the superior court determined that the section 1473.7 motion was untimely. We focus on Alatorre's subjective understanding, and given the compelling evidence on that issue we find it unnecessary to consider any potential factual disagreement between Alatorre and his attorneys as to what he was told in 2008 at the time of the plea.

2. The paragraph commencing at the bottom of page 30 with "There is little in the record" and ending at the top of page 31 with "communicated the prosecutor's offer to him," add new footnote 31 as follows:

31 In a petition for rehearing, the Attorney General contends we should remand for a new hearing where the prosecution could present the testimony of the lawyers who represented Alatorre at the time of the plea. (*Ante*, fn. 30.) Citing *Vivar, supra,* 11 Cal.5th at page 530, he suggests these attorneys might offer relevant testimony on Alatorre's priorities in negotiating a plea deal and whether he viewed deportation as a major concern. But the cited comments in *Vivar* were made in the context of discussing the *defendant's* burden to corroborate his assertion that he would not have entered the plea had he fully understood the immigration consequences. They cannot be read to authorize the *prosecution* to elicit testimony from Alatorre's former attorneys in violation of the attorney-client privilege.

Of course, there is a limited exception to the attorney-client privilege for communications "relevant to an issue of breach, by the lawyer or by the client, of a duty arising out of the lawyer-client relationship" (Evid. Code, § 958), and here the record is clear that the lawyers were subpoenaed by the prosecution solely "to refute any allegations of [ineffective] assistance of counsel." As we have explained, however, relief under section 1473.7 does not depend on a showing of ineffective assistance, and so any proffered evidence in this regard simply was not "relevant to an issue of breach." (Evid. Code, § 958; see also *Brockway v. State Bar* (1991) 53 Cal.3d 51, 63 ["Evidence Code section 958

only authorizes disclosure of relevant communications between a client . . . and an attorney charged with professional wrongdoing."].)

Respondent's petition for rehearing is denied.

There is no change in judgment.

HUFFMAN, Acting P. J.

Copy:  All parties

3

Filed 10/22/21 (unmodified opinion)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D077894 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF18829) |
| CARLOS ARGENIS FIGUEROA ALATORRE, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Imperial County, Monica Lepe-Negrete, Judge. Reversed with directions.

Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos, Seth Friedman and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

In the mid-2000s, Carlos Argenis Figueroa Alatorre was working as a car salesperson and had a second baby on the way. As sales plummeted and he found himself out of a job, he was approached by his brother-in-law, Luis, with an opportunity to make some quick cash. Although he knew Luis was involved in something unsavory, Alatorre began working for him, acting as a lookout and a driver for about two months before the United States Department of Justice closed in on Luis's drug importation ring, arresting Alatorre along with several others at a border patrol checkpoint where agents seized over thirty kilograms of cocaine.

In the wake of the arrest, Alatorre was forthcoming about his involvement. He had already been in jail for a year and a half, awaiting his trial, when he was offered a plea deal that would allow him to be released from custody with credit for time served. So in 2008, at the age of 24, he pleaded guilty to his first and only criminal charge—conspiracy to possess cocaine for sale.

Alatorre did not know this conviction would render him immediately deportable. He had come to the United States from Mexico when he was just four years old, and lived here as a permanent resident. In 2011, three years after his plea, he attempted to become a naturalized citizen, which had the unintended but very predictable consequence of alerting immigration authorities to his criminal conviction. Within a few months, he was deported to Mexico.

Alatorre lived in Mexicali after that, taking any available work he could find. Although his children, who are both U.S. citizens, were usually able visit him on the weekends, he was separated from life with his family—

not only his wife and children, but also his parents, four siblings, and dozens of nieces, nephews, and cousins—all of whom lived in the U.S.

Penal Code section 1473.7,[1] which was enacted by the Legislature in 2016 and became effective on January 1, 2017, created a new avenue of postconviction relief for noncitizens who pleaded guilty to a crime without fully comprehending the immigration consequences that might follow. (Stats. 2016, ch. 739 (Assem. Bill No. 813) § 1.) Although these motions are generally timely if a petitioner is no longer in custody, they can be deemed untimely if not brought "with reasonable diligence." (§ 1473.7, subd. (b).) In early 2020, Alatorre filed a motion to vacate his conviction under this statute, only to have the trial court deny it as untimely based on a finding that he did not exercise "reasonable diligence" to become aware of the existence of the statutory remedy after the law became effective.[2]

But what "reasonable diligence" means under the facts of this case is not readily apparent. That is because, for most immigration-related section 1473.7 petitions, diligence in bringing a motion is evaluated from the point in time that a petitioner faces a clear adverse immigration consequence as a result of the underlying conviction. Here, however, Alatorre's adverse event—his deportation—occurred years before section 1473.7 was enacted. The interesting question posed by this case is how a petitioner's "reasonable

---

[1]    All subsequent statutory references are to the Penal Code unless otherwise designated.

[2]    Section 1473.7 was twice amended after enactment. (See Stats. 2018, ch. 825 (Assem. Bill No. 2867) § 2, eff. Jan. 1, 2019; Stats. 2020, ch. 317 (Assem. Bill No. 2542) § 5, eff. Jan. 1, 2021.) Alatorre filed his motion under the version of the statute in effect in March 2020, which is largely identical to the current version.

diligence" should be evaluated when the ripening of an unexpected immigration consequence predates the creation of an avenue of relief.

The trial court here never addressed that question, finding Alatorre's petition untimely based on a fundamental-but-mistaken assumption that he was obligated to exercise reasonable diligence beginning from the date that the statute went into effect. But the reality is that a reasonable person in Alatorre's circumstances—convicted in 2008, deported to Mexico in 2011, and working as a day laborer—would have little reason to discover 2017 changes to California law that might provide a new way to contest an old conviction.

After considering the text, history, and purpose of section 1473.7, we reverse the trial court's ruling, finding that it applied an incorrect legal standard when it assumed Alatorre was obligated to learn about section 1473.7 starting in January 2017, when the section became effective. Borrowing from principles established in cases interpreting a similar statute in Oregon, we hold that where a petitioner's adverse immigration consequences predate January 1, 2017, a court assessing the timeliness of a section 1473.7 motion must determine when the petitioner would have had reason to seek legal help or otherwise investigate new forms of postconviction relief, and evaluate diligence from that point forward, in light of all the circumstances.

Guided by the Supreme Court's recent decision in *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), we also independently review the record in this case and conclude that Alatorre's motion was timely as a matter of law. As to the merits of his request, we find he established prejudicial error within the meaning of section 1473.7, and we remand to the trial court with instructions to issue an order granting the motion.

4

FACTUAL AND PROCEDURAL BACKGROUND

After his deportation, Alatorre periodically sought legal counsel, hoping to find a legal way to reenter the United States and reunite with his family. But differing reactions to his case from different attorneys left him confused about his prospects. He was unsure if he was being given proper advice, but was also generally aware that the laws might change at any time. For reasons that are not entirely clear, he decided in the late 2010's that he wanted to attempt to naturalize again. He contacted attorney Otis Landerholm for this purpose, and because he found Landerholm to be trustworthy and adept at explaining immigration law, he wanted to hire him. After saving up enough money to do so,[3] he retained Landerholm in September of 2019.[4] Landerholm assessed his case, identified Alatorre's 2011 conviction as a barrier, and referred him to the Nieves firm which specializes in postconviction relief. Less than a month later, Alatorre hired Nieves, borrowing considerable funds from his family in the United States to do so quickly.

The following March, Nieves filed a motion on Alatorre's behalf to withdraw his plea and vacate his conviction under section 1473.7, alleging his plea was invalid due to his counsel's failure to adequately advise him of the

---

[3] Alatorre made the U.S. equivalent of $100–$250 per week working in Mexico.

[4] There is conflicting information in the record as to whether Alatorre first contacted Landerholm in 2017 or 2019, but it is clear he was not able to hire Landerholm until 2019. The trial court indicated it was inclined to believe the first contact occurred after 2017.

5

immigration consequences he would face.[5]  At the motion hearing in July 2020, the trial court's primary concern was the timeliness of Alatorre's petition rather than its merits.[6]  In focusing on this issue, the trial court stated its view that "reasonable due diligence . . . assumes that a petitioner is attempting to avail himself of knowledge and attempting to seek relief continuously and . . . at least attempting to procure it."

When Alatorre testified, he summarized his efforts to obtain relief after his deportation, explaining that he contacted lawyers in both Mexico and the U.S., periodically conducted internet research about immigration, and then enlisted his family's financial help to hire Nieves after Landerholm's referral. The trial court found these efforts insufficient, concluding that Alatorre did not exercise reasonable diligence because he failed to take any action to vacate his conviction starting in January 2017 when section 1473.7 took effect.  The court implicitly assumed that any timeliness inquiry traced from the effective date of the statute.  In the court's view, the fact that Alatorre had "stumbled upon" section 1473.7 only after consulting a lawyer about naturalization weighed against him.  It ultimately denied his motion as untimely.

---

[5]    Alatorre's petition also stated another theory of relief under section 1016.5, which governs the trial court's obligation to ensure defendants who plead guilty are adequately informed of immigration consequences.  Because we resolve this appeal based on Alatorre's section 1473.7 motion, we need not consider his section 1016.5 motion.

[6]    As we will discuss more below, if a court determines that an immigration-related section 1473.7 motion was not filed with "reasonable diligence," in its discretion it may, but need not, deny the motion as untimely. (§ 1473.7, subd. (b)(2).)

6

A. *Where the Adverse Immigration Consequences Predate Section 1473.7, a
   Court Assessing the Timeliness of a Petition Must Consider When the
   Petitioner Would Have Reason to Learn About New Theories of Relief, and
   Whether the Petitioner was Reasonably Diligent After that Time.*

   1. *Our Standard of Review is Independent*

The Supreme Court recently clarified that appeals from section 1473.7
hearings are subject to independent review.  (*Vivar, supra*, 11 Cal.5th 510,
525.)  Under this standard, " 'an appellate court exercises its independent
judgment to determine whether the facts satisfy the rule of law.' "  (*Ibid.*)
Independent review extends particular deference to trial court findings "that
are based on ' "the credibility of witnesses the [superior court] heard and
observed" ' " but not to findings drawn from the "cold record" in the
proceeding, since the trial and appellate courts are in the same position when
tasked with interpreting such materials.  (*Id.* at p. 527.)  In this case, we
consider the trial court's interpretation of the reasonable diligence standard,
which presents a question of law.[7]

---

[7]     The superior court made some limited credibility findings that have no
bearing on the issue of how to apply the timeliness standard of section 1473.7
to the facts of this case.

2. *The Statute Itself is Ambiguous as to the Application of "Reasonable Diligence" for Petitioners Whose Adverse Immigration Consequence Predates Section 1473.7*

Although the trial court invoked the concept of reasonable diligence when it denied Alatorre's petition, it did so without reference to where the term appears in section 1473.7. We begin there, with the plain language of the statute, and construe "reasonable diligence" under established principles of statutory construction: " 'We must look to the statute's words and give them their usual and ordinary meaning.' " (*People v. Arias* (2008) 45 Cal.4th 169, 177 (*Arias*).)

Section 1473.7, subdivision (a) provides that persons no longer in criminal custody may file a motion to vacate a conviction under three different circumstances. It is the first of those that concerns us in this case.[8] Subdivision (a)(1) of the statute provides in relevant part that a motion to vacate can be brought if the "conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere." As the language of the statute makes clear, it was enacted to create postconviction relief for individuals whose convictions are legally invalid due to prejudicial error—but who are no longer imprisoned or restrained, and for that reason are unable to file a habeas corpus petition. (*Vivar*, *supra*, 11 Cal.5th 510, 523.)

---

[8]    Subdivisions (a)(2) and (a)(3) of section 1473.7 also permit a motion to vacate where there is newly discovered evidence of actual innocence (subd. (a)(2)), or where the conviction was racially or ethnically motivated (subd. (a)(3)).

Notably, the law contains two separate timeliness provisions. The one that governs immigration-related petitions contains no rigid time constraint; in fact, these motions are timely by default as long as the individual is no longer in custody. (§ 1473.7, subd. (b)(1).) But they may be deemed untimely if "not filed with reasonable diligence after the later of" (1) the initiation of immigration court proceedings against the party, (2) the denial of an immigration benefit, or (3) a final removal order. (*Id.*, subd. (b)(2).)[9]

"[T]he meaning of the timeliness provisions set forth in subdivision (b) of section 1473.7 . . . is a pure question of law," and was recently considered by the Fifth Appellate District in *Perez, supra,* 67 Cal.App.5th 1008. Because *Perez*'s analysis provides a helpful backdrop for our discussion, we briefly summarize the facts of the case. The petitioner in *Perez* filed his section 1473.7 motion in December 2019 to vacate a conviction entered after he pled guilty in 2000. (*Perez*, at p. 1012.) The People opposed on timeliness grounds, characterizing the motion as inexcusably delayed by 19 years. (*Ibid.*) After a brief comment in which the trial court explained that it would like to grant relief on humanitarian grounds but felt otherwise constrained, it regretfully denied the motion. (*Ibid.*)

In considering the propriety of the trial court's denial, *Perez* gave a thorough account of changes to the statutory language regarding the timeliness requirements for immigration-related section 1473.7 petitions. It began by observing that the first version of the statute, which became effective in January of 2017, indicated such petitions "shall be filed with reasonable diligence after the later of" the triggering events. (*Perez, supra,*

---

9    For the purposes of this discussion, and consistent with other cases, we refer to these as "triggering events." (See *People v. Perez* (2021) 67 Cal.App.5th 1008, 1014, fn. 6 (*Perez*).)

9

67 Cal.App.5th at p. 1013.) It reasoned from the Legislature's initial use of "shall" that "courts were required to deny a motion when the moving party had not acted with reasonable diligence in filing the motion." (*Ibid.*) But it went on to explain that the Legislature made significant changes to this language when it amended the section two years later. In the updated version, which became effective in 2019, the Legislature specified that motions "shall be deemed timely filed at any time in which the individual filing the motion is no longer in criminal custody," but "may be deemed untimely filed if it was not filed with reasonable diligence after the later of" the triggering events. (*Ibid.*) From this shift in language, *Perez* concluded that as a "general rule" motions submitted by petitioners no longer in custody were timely (*id.* at p. 1012), but as an exception to that rule, if a trial court finds that a petitioner did not exercise reasonable diligence, the court *may* exercise its discretion to deem a motion untimely. (*Id.* at p. 1015.) In other words, "[t]he lack of reasonable diligence does not automatically require the superior court to deem the motion untimely," but if the court elects to consider timeliness, it may do so in light of the "totality of the circumstances." (*Ibid.*)

By explaining the scope of the trial court's discretion under the amended statute, *Perez* clarified that "reasonable diligence" is not a timeliness *requirement* for section 1473.7 motions made under subdivision (a)(1), but rather a *condition* that, if present, requires the court to grant meritorious motions. Conversely, if the condition is lacking, the court is then empowered to exercise its discretion to either consider the merits or deny the motion on timeliness grounds.

Here, it is not clear whether the trial court understood that it was making a discretionary decision when it denied Alatorre's motion as

untimely. But of course, it did not have the benefit of *Perez's* statutory construction at the time. Nor did it give a clear indication—as the trial court in *Perez* did—that it would have granted the motion if it understood that it had the discretion to do so. Regardless, the heart of the trial court's evaluation of timeliness in this case lies elsewhere and requires that we address an issue *Perez* did not reach: how to analyze whether a petitioner exercised reasonable diligence in cases where the petitioner's triggering events predate section 1473.7.

Returning to the statutory text, we observe that the timeliness provision is silent on this point. It plainly states that the trial court may deem a motion untimely "if it was not filed with reasonable diligence after the later of" the triggering events, but says nothing about how the trial court should evaluate diligence if all of the triggering events happened *before* the statute was effective. Given this statutory silence, "we employ 'the ordinary presumptions and rules of statutory construction' " to determine how to construe "reasonable diligence" in this factual context. (*People v. Bear* (2018) 25 Cal.App.5th 490, 498; see also *American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 290 ["When a statute is silent on a point, the courts resort to statutory interpretation."].)

We look next at the context of the timeliness provision, and draw what inferences we can from its contents, structure, and counterpart within the same section. "Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible." (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844.) First, we observe that the provision's list of triggering events acts as a type of notice for the petitioner. Because subdivision (a)(1) of section 1473.7 exists to help petitioners who did not comprehend the potential adverse immigration

11

consequences of a past criminal plea, the statute presumes that the occurrence of the adverse triggering event—such as a summons to immigration court, or a notice of removal—will alert petitioners that they misunderstood the consequence of their conviction. The statute's legislative history further underscores the point: "While the criminal penalty for a conviction is clear, the immigration penalty can remain 'invisible' until an encounter with the immigration system raises the issue." (Sen. Com. on Pub. Safety, com. on Assem. Bill No. 813 (2015–2016 Reg. Sess.) May 10, 2016.) The Legislature thus recognized that the class of petitioners subdivision (a)(1) aims to help usually remain *unaware* of their own injury until an encounter with the immigration system makes the consequences of their pleas plain. From this, it is only logical to infer that the Legislature presumed, in drafting subdivision (b)(2), that petitioners had *not yet* suffered the adverse consequence that would prompt them to seek legal help. In all likelihood, the order of events presented in this case—the adverse consequences occurred before the creation of the statutory remedy—was simply not contemplated.[10]

Turning to the broader structure of the timeliness provision, we find significant indicators of a legislative intent toward leniency in filing. A petitioner's reasonable diligence is measured from the *later* of three possible

_____

[10]   Another way to explain this omission would be to conclude that the Legislature intended the section to only apply prospectively, to petitioners who pleaded guilty after its effective date. We have already considered, and rejected, this possibility. (*People v. Perez* (2018) 19 Cal.App.5th 818, 827 ["[W]e do not read the statute as limiting relief as to defendants who pled guilty only after the statute's effective date. . . . [T]he statute's own language indicates that it can be applied retroactively if the moving party satisfies the requirements of the statute."]; see also *People v. Tapia* (2018) 26 Cal.App.5th 942, 949.)

12

triggering events.  Under this framework, the same petitioner could receive notice to appear in immigration court (§ 1473.7, subd. (b)(2)(A)), and do nothing at all for months, or even years, until a final removal order is issued. (*Id.*, subd. (b)(2)(B)).  That petitioner's motion would still be deemed timely as long as the individual demonstrates reasonable diligence in filing the motion after the later event—in this example, the removal order.  It would be irrelevant that the petitioner did nothing in the interim between the two triggering events.  This legislative choice stands in stark contrast to other laws where timeliness is evaluated from the *earliest* point at which a litigant might reasonably be expected to pursue some newly available remedy.  (See, e.g., § 1509, subd. (g) [giving a one-year timeline to file a habeas corpus petition for capital convictions that predated the section, or "within the time allowed under prior law, whichever is earlier."].)

Our final contextual clue comes from the timeliness provision that governs the other grounds for a section 1473.7 motion—the discovery of new evidence of actual innocence or evidence that a conviction was racially or ethnically motivated.  (§ 1473.7, subd. (a)(2)–(3).)  These claims are subject to a different timeliness standard, and "shall be filed without undue delay from the date the moving party discovered, or could have discovered with the exercise of due diligence, the evidence that provides a basis for relief . . . ." (*Id.*, subd. (c).)  It is thus clear that the Legislature imposed a due diligence requirement to proactively investigate new, relevant information on two classes of people who might qualify for section 1473.7 relief—but, notably, not the class of petitioners whose basis for the motion is unexpected immigration consequences.  That these provisions were drafted together and enacted in the same year only underscores our conclusion that the Legislature created a strikingly generous timeliness standard for immigration-related petitions.

While this contextual analysis yields significant indicators of general legislative intent and motivations, it still does not clarify how to construe "reasonable diligence" in the specific factual situation before us. We thus turn to the section's purpose and history for further guidance. (See *Arias, supra,* 45 Cal.4th at p. 177 [in the service of statutory construction, "we may consider a variety of extrinsic aids, including legislative history, the statute's purpose, and public policy"].) There, we find strong evidence that the reasonable diligence standard imposed by the trial court in this case contravenes the Legislature's intent.

In March 2015, Assembly Bill No. 813,[11] an early draft of what would become section 1473.7, included the effective date of the statute as one of the triggering events. At the time, it read as follows: "(b) A motion pursuant to this section shall be filed with reasonable diligence after the later of [the triggering events]" including "(4) [T]he effective date of this section." (Assem. Amend. to Assem. Bill No. 813 (2015–2016 Reg. Sess.) Mar. 26, 2015.) But in June, the Senate amended the bill to strike subdivision (b)(4). (Sen. Amend. to Assem. Bill No. 813 (2015–2016 Reg. Sess.) June 22, 2015.) This indicates the Legislature specifically considered but ultimately rejected the statute's effective date as a possible event that could trigger a petitioner's responsibility to exercise diligence. Yet this is precisely the standard the trial court applied when it stated that reasonable diligence for someone like

---

11    Assembly Bill No. 813 was the origin of section 1473.7. (Assem. Bill No. 813 (2015–2016 Reg. Sess.) § 1.)

Alatorre means he must "[attempt] to avail himself of knowledge and . . . seek relief continuously"[12] from the time when section 1473.7 came into effect.[13]

Where the Legislature has expressly declined to include a provision in a statute, we will neither supply it anew nor affirm its implicit use. (See, e.g., *Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 85 ["In construing a statute, we are ' "careful not to add requirements to those already supplied by the Legislature." ' "]; *Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 274 ["In the construction of a statute or instrument [courts do not] insert what has been omitted, or . . . omit what has been inserted"]; *Santa Fe Transp. Co. v. State Bd. of Equalization* (1959) 51 Cal.2d 531, 539 [when the Legislature fails to put limitations into a statute, it " 'must be deemed to have omitted [the language] intentionally' "].) Consequently, we cannot endorse the framework used by the trial court to assess Alatorre's diligence.

---

[12] Section 1473.7 does not define the term "reasonable diligence." The Supreme Court has defined reasonable diligence in other contexts as resisting any " 'mechanical definition' " (*People v. Cromer* (2001) 24 Cal.4th 889, 904), but generally comprising " ' "untiring efforts in good earnest" ' " and " ' "efforts of a substantial character." ' " (*People v. Cogswell* (2010) 48 Cal.4th 467, 477.) Although here the trial court's functional definition of the term appears accurate enough, its application to when the diligence period began is the source of our concern.

[13] At the proceedings in the trial court, the parties debated whether the reasonable diligence "clock" should start for Alatorre in 2017, when section 1473.7 first became effective, or in 2019, when it was amended (arguably changing the law in his favor). Neither position is tenable given the legislative history of the section.

3.    *The Meaning of "Reasonable Diligence" in the Context of Postconviction Relief*

What is less clear, however, is what framework trial courts *should* employ in evaluating the timeliness of petitions like Alatorre's, where the triggering event occurred before the statute's effective date.[14]  Because neither our textual nor purposive examinations of section 1473.7 definitively answer this question, we turn to broader caselaw for guidance, finding a helpful analogue in recent cases concerning a similar statute in Oregon—the Uniform Post-Conviction Procedures Act (PCPA), Oregon Annotated Statutes, section 138.510 et seq.  (*Bogle v. State* (Or. 2018) 423 P.3d 715, 719 (*Bogle*).)

Oregon's PCPA "was enacted to establish an exclusive procedure through which a person convicted of a state crime can challenge his or her conviction."  (*Bogle, supra,* 423 P.3d at p. 719.)  It affords relief to a petitioner convicted of a crime who can establish a "substantial denial" of the petitioner's rights "in the proceedings resulting in the petitioner's conviction . . . [which] rendered the conviction void."  (Or. Rev. Stats. Ann., tit. 14, § 138.530(1)(a).)  This language closely parallels section 1473.7, subdivision (a)(1), in which a conviction is considered "legally invalid" due to a prejudicial defect.  And although the PCPA does not contain an explicit provision regarding claims that hinge on inadequate understanding of adverse immigration consequences, Oregon petitioners can raise an Oregon

---

14    We emphasize that a timeliness inquiry is always discretionary; as long as a petitioner is no longer in criminal custody, the trial court is never obligated to deny an immigration-related section 1473.7 petition for lack of timeliness.  (*Perez, supra*, 67 Cal.App.5th at pp. 1015–1016.)

Annotated Statutes, section 138.530(1)(a) claim using a *Padilla* theory.[15] (See, e.g., *Gutale v. State* (Or. 2019) 435 P.3d 728, 729 (*Gutale*).) These similarities enable us to draw helpful insights from Oregon authority construing the bounds of PCPA relief.

The PCPA provides a two year time limit to file a petition for postconviction relief after the final entry of judgment in a petitioner's case. But it also includes an "escape clause" allowing a later filing if the grounds for relief could not reasonably have been raised within the two-year period. (Or. Rev. Stats. Ann., § 138.510(3).)

In *Gutale, supra*, 435 P.3d 728, the Oregon high court considered whether an otherwise untimely PCPA petition fell within the escape clause. Gutale did not learn he was deportable as a result of a guilty plea until after the two-year window to file his petition had elapsed. (*Id*. at p. 731.) He argued he could not reasonably have known about the deficiency in his plea process before he was taken into ICE custody, but the Oregon intermediate appellate court affirmed the trial court's denial of his motion as untimely "based on the principle that 'persons are assumed to know laws that are publicly available and relevant to them,' including relevant immigration law." (*Id*. at pp. 730, 734.) In rejecting the appellate court's mechanical application of a duty to know the law, Oregon's high court explained that a proper analysis of whether the escape clause applied would necessarily include consideration of "both whether the petitioner reasonably could have accessed the ground for relief and whether a reasonable person in the petitioner's

---

[15]  See *Padilla v. Kentucky* (2010) 559 U.S. 356, 367–369 [criminal defense counsel must provide accurate advice to noncitizen defendants regarding potential immigration consequences of their cases].

situation would have thought to investigate the existence of that ground for relief." (*Id*. at p. 734.)[16]

Although *Gutale* was construing a different statute with a different timeliness standard, we find its reasoning persuasive, not least because California's section 1473.7 reflects an even more lenient legislative intent than its Oregon counterpart.[17] We are thus convinced that the standard advanced in *Gutale* can be utilized in effectuating our Legislature's intent. To that end, the critical question posed in *Gutale* is one we adopt for purposes of analyzing the timeliness of Alatorre's petition: What event in Alatorre's life that occurred *after* section 1473.7 became effective would have given him "a reason to look for the existence of [new] legal grounds for relief" or, at a minimum, "put him on notice of the need to investigate[?]" (*Gutale, supra,* 435 P.3d at p. 734.)[18]

---

[16]    At our request, the parties submitted supplemental briefing regarding the application of *Gutale, supra*, 435 P.3d 728 to this case.

[17]    This is evident from the differences in the timeliness provisions. Where the Oregon Legislature elected to use a two-year limit for most cases, with an escape clause for claims that could not have been reasonably raised earlier, our Legislature opted for a general presumption of timeliness with the caveat that petitioners would do well to exercise reasonable diligence after their adverse consequences ripen, lest the trial court exercise its discretion to deem their motions untimely. (*Perez, supra*, 67 Cal.App.5th at pp. 1014–1015.)

[18]    One intermediate appellate court decision filed before *Gutale* reached a different conclusion on facts quite similar to ours. (*Hernandez-Zurita v. State* (Or. 2018) 417 P.3d 548 (*Hernandez-Zurita*).) Without the benefit of *Gutale*'s reasoning*, Hernandez-Zurita* rejected a petitioner's timeliness claim that he qualified under the PCPA escape clause due to obstacles he faced in obtaining legal materials and counsel while in Mexico. (*Hernandez-Zurita,* at pp. 553−554.) Like the superior court in our case, the court reasoned that the asserted grounds for relief were published and available to the general public

4. *The Maxim that Everyone is Presumed to Know the Law Does Not Apply Here*

In arguing that the *Gutale* formulation should not apply to petitions under section 1473.7, the People cite to the well-established legal presumption that everyone knows the law—the same presumption that *Gutale* contextually disapproved. (See 435 P.3d at p. 733 ["Being reasonably available means more than just that a petitioner could have found the law if he or she had looked. Instead, a ground for relief is reasonably available only if there was a reason for the petitioner to look for it."].) In a similar vein, Alatorre suggests it would be "draconian to rule that a deported . . . Mexican [citizen] making no more than $250 a [week] should have known about the passage of section [1473.7] before he did." As we explain, we agree with Alatorre and would not impose on him or those similarly situated a presumptive knowledge of the law. Apart from the statutory timeliness factors we discuss above, the underlying basis for the presumption, relevant legal precedent, and the fair administration of the law all counsel against the application of the maxim in cases like this.

We begin by noting that the maxim "everyone is presumed to know the law" is not a presumption of fact, but rather a rule of substantive law. (*Murphy v. Sheftel* (1932) 121 Cal.App. 533, 538 (*Murphy*).) It is another way

_____

at the time petitioner was convicted. (*Ibid*.) Drawing from other cases, it further stated that " 'the applicability of the escape clause turns on whether the information existed *or was reasonably available to the petitioner*, and not on whether the petitioner's failure to seek the information was reasonable.' " (*Id.* at p. 552.) The Oregon Supreme Court vacated the *Hernandez-Zurita* decision and remanded for reconsideration in light of *Gutale* (*Hernandez-Zurita v. State* (Or. 2019) 451 P.3d 236), "after which the case was jointly dismissed by the parties." (*Canales-Robles v. Laney* (Or. 2021) 314 Or.App. 413, 420, fn. 1.) Finding *Gutale*'s reasoning more compelling, we use it for guidance.

of saying that ignorance of the law will not be recognized as a legal defense. The presumption cannot be rebutted even in the face of overwhelming evidence of actual ignorance.[19] (See, e.g., Leonard, *Towards A Legal History of American Criminal Theory: Culture and Doctrine from Blackstone to the Model Penal Code* (2003) 6 Buff. Crim. L.Rev. 691, 770 [citizens are presumed to know the law "not as a rebuttable factual matter but as a legal rule"].)

Historically, the presumption that everyone knows the law has enjoyed widespread application in the criminal justice system,[20] where it can be restated as the principle that "one may not escape criminal liability by claiming ignorance of the law." (*Hutson v. Wenatchee Fed. Sav. and Loan Asso* (Wash. 1978) 588 P.2d 1192, 1196 (*Hutson*); accord, *People v. McLaughlin* (1952) 111 Cal.App.2d 781, 788 ["No doctrine is more universal or of more ancient vintage in the law than that ignorance of the law excuses no one"]; 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2021) Defenses, § 44.) In civil proceedings, the presumption is usually confined to cases where particular parties, by nature of their professions or business dealings, "ought to know the law, such as a state banking supervisor, who should be presumed to know banking law . . . ." (*Hutson, supra*, 588 P.2d at p. 1196; see also *Phillippe v. Shapell Industries* (1987) 43 Cal.3d 1247, 1260–1262 [distinguishing between licensed and unlicensed brokers in concluding that licensed brokers presumptively know the law governing contract formation];

---

[19] Indeed, if everyone were really presumed to know the law, we would not need lawyers to advise and courts to decide what the law is. As the old joke goes, everyone is presumed to know the law . . . except a law student taking the bar exam.

[20] See, e.g., Keedy, *Ignorance and Mistake in the Criminal Law* (1908) 22 Harv. L.Rev. 75, 77.

*1119 Delaware v. Continental Land Title Co.* (1993) 16 Cal.App.4th 992, 1002 [contractor for commercial property inquiry presumed to know relevant zoning ordinance].)

But as an early appellate decision observed, "the proposition that everyone is presumed to know the law rests upon no basis of fact." (*Murphy, supra,* 121 Cal.App. at p. 538.) It is, in reality, "based on a fiction, because no man can know all the law . . . ." (*People v. O'Brien* (1892) 96 Cal. 171, 176.) But that fiction is justified because "[t]he rule rests on public necessity; the welfare of society and the safety of the state depend upon its enforcement." (*Ibid.*) Because it is primarily a mechanism for convenience in administrating the law (*Murphy,* at p. 538), the presumption is "[not] available for the purpose of supplying evidence of a fact material to [a] controversy nor to prevail against the real truth as to any particular situation except as regards punishment for a criminal offense or responsibility for actual damage for the violation of private rights [citation]." (*Id.* at pp. 538–539.) In other words, as a general rule the presumption only prevents someone from claiming ignorance of the law *in order to escape criminal or civil responsibility.* It has no application in a case like this to deny a person statutory relief to which they would otherwise be entitled merely because they might have discovered their statutory remedy if they had reason to look.

A closer examination reveals yet another reason to refrain from applying the presumption in cases like this: it does not apply to foreign nationals. A person is not presumed to know the law of another state or country where they do not live or work. (*Tavares v. Glens Falls Ins. Co.* (1956) 143 Cal.App.2d 755, 760 ["There is no presumption as to knowledge of

21

a law where the law is the law of a foreign country."].)[21]  The reason for this is apparent when we consider that Alatorre, a Mexican citizen living in Mexico, would have even less opportunity to learn about a newly enacted California law than the average Californian—though we doubt many residents of this state keep abreast of changes to the Penal Code.  Even if they did, the scope of relief available under section 1473.7 would not have been clear to just anyone who happened to read about its enactment.  It adds a layer of complexity to the already bewildering interplay between state criminal proceedings and federal immigration enforcement—an area of the law that has "aptly been called a labyrinth that only a lawyer could navigate." (*Biwot v. Gonzales* (9th Cir. 2005) 403 F.3d 1094, 1098.)

In section 1473.7, the Legislature has expressed its particular concern for immigrants who suffer convictions without understanding that it will in the future result in their deportation or other adverse immigration consequences.  It is a highly unique statute in that a failure to understand the law is the essential predicate for relief.  To insist in this context that petitioners are irrebuttably presumed to be aware and appreciate the significance of a new change in the law—despite all evidence to the contrary—would deny relief by substituting reliance on one legal misunderstanding for another in contravention of a manifest legislative intent.

In summary, "while it is essential to the due administration of justice that no person avoid liability for his *wrongdoings* on a claim of ignorance of

---

[21]  In citing to caselaw stating that U.S. citizens are generally responsible to know the laws that govern them, the People apparently overlook the fact that Alatorre is neither a U.S. citizen, nor was he residing in the United States when section 1473.7 became effective.

the law, 'the law is not so senseless as to make absurd presumptions of fact.' " (*Claremont v. Truell* (N.H. 1985) 489 A.2d 581, 586.) Here, the presumption that Alatorre could or should have known about section 1473.7 as of the date of its enactment, of his own accord, without the aid of a lawyer and without some event that would prompt him to retain one, borders on the absurd. We instead hold that individuals seeking this type of postconviction relief cannot be conclusively presumed to know of the existence and significance of the statutory remedy. (See *Bibeau v. Pacific Northwest Research Foundation Inc.* (9th Cir. 1999) 188 F.3d 1105, 1110–1111 [defendant was not presumed to know he was injured as of the effective date of a statute providing relief for his class of injuries].)

5.  *To Assess Timeliness for Petitioners Whose Adverse Immigration Events Predate Section 1473.7, Courts Should Ask When Petitioners Had Reason to Become Aware of the Statutory Remedy*

Putting all of these components together, we conclude it is most consistent with the meaning and purpose of section 1473.7 to evaluate reasonable diligence in cases where the petitioner's triggering events predated the law by determining whether or when the petitioner had a reason to inquire about new legal grounds for relief, and assessing the reasonableness of the petitioner's diligence from that point forward. Just as the triggering events in the statute provide petitioners still in the U.S. with notice of a *fact* (such as pending deportation), courts must look for an analogous event in the life of petitioners like Alatorre that would provide notice of a *change in the law* that the petitioner would otherwise have no occasion to learn about (such as the availability of relief under section

23

1473.7).[22]  And as in many areas where the court exercises its discretion, it must take into account the totality of the circumstances.  (*Perez, supra,* 67 Cal.App.5th at p. 1012.)

B.  *Independently Reviewing Alatorre's Motion, We Conclude It Was Timely and Should Be Granted.*

Having concluded that the trial court made an error of law when it faulted Alatorre for not exercising reasonable diligence from the point at which a change in the law favorable to him took effect, we now consider how to remedy that mistake.  In many similar scenarios, we would remand for reconsideration by the trial court.  Here, however, as a matter of law Alatorre's motion was both timely and legally sufficient to demonstrate his entitlement to relief under section 1473.7.  Consequently, there is no need for further consideration in the superior court, and the "appropriate remedy is to direct the trial court to grant the motion."  (*People v. Camacho* (2019) 32 Cal.App.5th 998, 1012 (*Camacho*).)

1.  *Alatorre's Motion Was Timely*

As the *Perez* decision made clear, immigration-related petitions are presumptively timely once the petitioner is released from custody, and trial courts can only deem a motion untimely if it was not filed with reasonable diligence after the later of the triggering events.  (*Perez, supra,* 67 Cal.App.5th at pp. 1013–1014; § 1473.7, subd. (b).)  Applying the principles we have articulated, we identify Landerholm's referral of Alatorre to the

---

[22]  This is not to say we "adopt a standard of *actual knowledge* for a person who forgoes legal representation or advice and remains, by his own choice, ignorant of possible grounds for seeking post-conviction relief."  (*Hernandez-Zurita, supra,* 417 P.3d at p. 552.)  Ignorance can be either reasonable or unreasonable, and only reasonable ignorance equates to a reasonable delay.  We trust trial courts in the first instance to assess whether a petitioner's delay in filing is reasonable or unreasonable given all the circumstances.

24

Nieves firm to be a clear point at which Alatorre had a reason to look for new legal grounds for relief. This is because Landerholm's referral put Alatorre on notice of two legal realities that should have led him to discover section 1473.7: (1) that he could not legally return to the U.S. due to his conviction[23] and, even more critically, (2) that he might be eligible for a form of postconviction relief that would enable him to vacate the conviction.

Once we identify the point at which Alatorre would have reason to look for legal relief, we evaluate his diligence from that time forward. A reasonably diligent person in Alatorre's position would either follow up on the Nieves referral or, at a minimum, begin to investigate post-conviction relief. Here, Alatorre accomplished the former in a month. He was referred by Landerholm in August of 2019, and by September he had retained Nieves.[24] A period of approximately one month between a petitioner's triggering event and the hiring of legal counsel cannot be considered an unreasonable delay. (*People v. Rodriguez* (2019) 38 Cal.App.5th 971, 979 [petitioner who filed a motion less than a month after the appellate court alerted him that he might qualify for section 1473.7 relief exercised reasonable diligence].) We thus conclude that Alatorre acted with reasonable diligence. Given that he is no longer in custody, his motion was timely. (§ 1473.7, subd. (b)(1).)

---

[23]     Alatorre hired Landerholm because he wanted to try again to naturalize. We infer from this fact that he still did not fully understand at the time that his conviction was an absolute barrier to becoming a U.S. citizen.

[24]     Although it took Nieves until March of 2020 to file Alatorre's motion, the trial court explained that it would not consider the period between September and March to weigh against him, nor would it fault his attorneys for taking a few months to investigate, compile records, and prepare the motion. We accept the trial court's analysis on this point.

## 2. *Alatorre Established Prejudicial Error*

We turn now to the merits of Alatorre's petition. Pointing to various statements by the judge during the hearing,[25] he asserts that the trial court "implicitly ruled that [he] would have prevailed on the merits" but for its timeliness finding. Not surprisingly, the People dispute this characterization of the court's comments. And while it is evident that the court considered timeliness a threshold matter to be addressed before the merits of the petition, it is far less clear whether or to what extent the court expressed views on the merits of Alatorre's claim *assuming his petition was timely.*

Fortunately, interpreting the superior court's comments is unnecessary because whether a petitioner establishes prejudicial error is "[u]ltimately . . . for the appellate court to decide, based on its independent judgment." (*Vivar, supra,* 11 Cal.5th at p. 528.) Developing caselaw construing section 1473.7 makes it clear that on the undisputed facts of this case, Alatorre is entitled to relief.

Section 1473.7, subdivision (e)(1) indicates that the trial court "shall grant the motion to vacate" if the moving party shows, by a preponderance of the evidence, that the party is entitled to relief. When the motion is based on a misunderstanding of immigration consequences, the petitioner must show the challenged conviction is either causing or could cause (1) removal or (2) the denial of an immigration benefit, lawful status, or naturalization. Subdivision (e)(4) further specifies that to grant relief on an immigration-related motion, "the only finding that the court is required to make is whether the conviction is legally invalid due to prejudicial error damaging

---

[25] For instance, at one point in the hearing the court commented, "I'm addressing the timeliness issue, because if it's not timely or it is timely, it's very dispositive towards the rest of the motion."

the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere."

Here, there can be little doubt Alatorre has demonstrated that the conviction he challenges caused his deportation and has twice undermined his attempts to naturalize. These facts were uncontested. We thus proceed to consider whether an error occurred that damaged his ability to understand the immigration consequences of his plea, and if so, whether Alatorre was prejudiced by that error.

   a.    *The error can be a defendant's own*

Alatorre submitted a declaration in support of his motion asserting that he did not understand when he pleaded guilty that his conviction would make him deportable,[26] and that if he had known, he would have proceeded to trial rather than accept the plea. He further stated that his defense attorney did not advise him of any adverse immigration consequences.[27]

When Alatorre filed his motion, the courts of appeal were still coming to terms with the full effect of the Legislature's 2019 amendment to section 1473.7. Among other things, the amendment clarified that successful immigration-related petitions did not have to hinge on ineffective assistance of counsel claims—a requirement that had been read into the first version of the section by reviewing courts. (*Camacho, supra,* 32 Cal.App.5th at p. 1005;

---

[26]    Alatorre's conviction qualified as an "aggravated felony" for purposes of federal immigration enforcement, which rendered him both deportable and ineligible for discretionary forms of relief. (See *Moncrieffe v. Holder* (2013) 569 U.S. 184, 187.)

[27]    We also note that the probation report erroneously listed Alatorre as a United States citizen—a detail that further corroborates his account.

§ 1473.7, subd. (a)(1).) In untethering these petitions from the *Strickland* standard for assessing ineffective assistance,[28] appellate analysis has come to recognize both (1) errors of counsel that did not amount to constitutionally deficient representation and (2) the "defendant's own error" as potential bases for claims.

*Camacho* was the first case to recognize that the "error" sufficient to invalidate a plea for purposes of section 1473.7 "included defendant's own error in believing that a negotiated plea . . . would avoid making him deportable, and in not knowing that his plea would subject him to mandatory deportation and permanent exclusion from the United States."[29] (*Camacho, supra,* 32 Cal.App.5th at p. 1009.) And while this error assessment was arguably nuanced because *Camacho* identified two separate errors—one of which was attributable to the defendant and the other to his counsel (*ibid.*)— later cases included no similar subtleties.

Thus in *People v. Mejia* (2019) 36 Cal.App.5th 859 (*Mejia*), the court held that to establish error sufficient to trigger a section 1473.7 petition, "a person need only show by a preponderance of the evidence [that] he did not 'meaningfully understand' or 'knowingly accept' the actual or potential adverse immigration consequences of the plea." (*Id.* at p. 862.) The court

---

[28] In *Strickland v. Washington* (1984) 466 U.S. 668, 694, the Supreme Court held that a defendant demonstrates ineffective assistance of counsel by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

[29] The superior court was quite familiar with *Camacho,* summarizing it as holding that "an error that damages the defendant's [*sic*] ability to minimally understand, defend against, and knowingly accept the adverse immigration consequences of a plea are prejudicial and would merit relief under 1473.7."

agreed with the defendant that "[t]he key to the statute is the mindset of the defendant and what he or she understood—or didn't understand—at the time the plea was taken." (*Id.* at p. 866.) Quoting *Camacho*, the *Mejia* court emphasized what it believed was a clear and broad legislative intent in holding that the "the focus of the inquiry in a section 1473.7 motion is on the '*defendant's own error . . . .*'" (*Mejia,* at p. 871, italics added.)

Later cases have uniformly followed the lead of *Camacho* and *Mejia*, concluding that a petitioner's own subjective error qualifies for relief under the statute if the evidence shows he or she misunderstood the immigration consequences of a plea deal. (See *People v. Jung* (2020) 59 Cal.App.5th 842, 856 (*Jung*) [an "error" under section 1473.7 "may be the moving party's own mistake of law or inability to understand the potential adverse immigration consequences of the plea"]; *People v. Rodriguez* (2021) 68 Cal.App.5th 301 (*Rodriguez*) [citing *Mejia* and *Jung*].) Under this principle, the "error" is that the petitioner subjectively misunderstood the immigration consequences of the plea, and there is no additional need to establish this mistake was caused by some "third party."[30] (*Jung,* at p. 856.)

---

[30] Alatorre's plea form only indicated that the plea "*could* result in my being deported." Counsel told the court at the hearing that there was no transcript of the plea proceedings in 2008. Alatorre submitted a declaration in which he stated he was never advised by his counsel "that a conviction for the crime(s) charged could directly result in my deportation, exclusion, and denial of naturalization of citizenship from the United States, my home." Two lawyers involved in the representation of Alatorre were subpoenaed by the People for the hearing but never testified, presumably because the superior court focused on the timeliness issue. We focus on Alatorre's subjective understanding, and given the compelling evidence on that issue we find it unnecessary to consider any potential factual disagreement between Alatorre and his attorneys as to what he was told in 2008 at the time of the plea.

This is not to say, of course, that a section 1473.7 petition will always be granted merely because the petitioner claims to have misunderstood the consequences of a plea. But there can be little doubt in this case that Alatorre never appreciated his plea and subsequent conviction made him *automatically* deportable. Indeed, it was Alatorre's misguided efforts to become a naturalized citizen within three years of his conviction that brought him to the attention of immigration authorities and triggered his own deportation. It goes without saying that someone who understood his criminal conviction made him automatically deportable would not voluntarily contact immigration authorities and advise them of his presence in the country. This alone demonstrates it is more likely than not that Alatorre failed to "meaningfully understand" the consequences of his plea. (See *People v. Rodriguez* (2021) 60 Cal.App.5th 995, 1003 [" 'A fact is proved by a preponderance of the evidence if . . . it is more likely than not that the fact is true.' "].)

b.      *Alatorre has demonstrated a right to relief*

Alatorre has thus established error under section 1473.7. To assess prejudice, we now consider whether he has " 'demonstrat[ed] a reasonable probability that [he] would have rejected the plea if [he] had correctly understood its actual or potential immigration consequences.' " (*Vivar, supra,* 11 Cal.5th 510, 529–530.) And "we have long required the defendant corroborate such assertions with ' "objective evidence." ' " (*Id.* at p. 530; see also *Mejia, supra,* 36 Cal.App.5th at p. 872 ["courts should not simply accept a defendant's statement of regret regarding the plea [but] should also 'look to contemporaneous evidence' "].) This is a "totality of the circumstances" analysis, where factors such as the petitioner's ties to the U.S., plea

priorities, and the importance of avoiding deportation are paramount. (*Vivar,* at p. 530.)

There is little in the record to establish Alatorre's priorities in discussing a plea deal with his defense counsel, and indeed, part of his claim is that he spoke infrequently with his defense attorney and that another attorney actually communicated the prosecutor's offer to him. But other important factors of a type frequently highlighted by appellate courts weigh heavily in Alatorre's favor—particularly his close ties to the U.S. (*Mejia, supra*, 36 Cal.App.5th at p. 872 [citing Mejia's deep ties to the U.S. as "compelling evidence" of prejudice]; *Jung, supra*, 59 Cal.App.5th at p. 858 [prejudice demonstrated by the fact that Jung was brought to the United States at the age of three, grew up and attended school here, and had her entire network of "friends, family, and community ties" in the United States]; *Rodriguez, supra,* 68 Cal.App.5th at p. 324 [describing Rodriguez's "deep, lifelong ties to the United States"]; *Camacho, supra*, 32 Cal.App.5th at p. 1011 [prejudice established because Camacho was "brought to the United States over 30 years ago at the age of two, has never left this country, and attended elementary, middle, and high school in Los Angeles county [and] is, and at the time of his plea was, married to a United States citizen with an American citizen son, and now also an American citizen daughter"]; accord, *Vivar, supra,* 11 Cal.5th at p. 530.)

The facts presented in Alatorre's case are no less compelling. He was still a preschooler when he came here in 1987. All of his family lived in the United States, including his parents who passed away after he was deported. Alatorre married a U.S. citizen, and together they have two children who are both citizens. His single involvement with the criminal justice system led to his continuing separation from his family. And in the years he spent living in

31

the shadow of that mistake, he stayed close to the border so he could see his children on weekends.

Given all of this, we find it reasonably probable that if he had understood the certain immigration consequences of his plea, he would have either pressed for an immigration-neutral deal, if possible, or taken his case to trial. His deep ties to the United States provide "contemporaneous evidence" that avoiding deportation would have been a paramount concern if he had truly understood his situation. (*Lee v. U.S.* (2017) 137 S.Ct. 1958, 1961.) Alatorre appears to be in the class of defendants who would "risk additional prison time in exchange for holding on to some chance of avoiding deportation." (*Id.* at p. 1962.) He has thus carried his burden and is entitled to relief. (§ 1473.7, subd. (e)(1) ["The court shall grant the motion to vacate the conviction or sentence if the moving party establishes, by a preponderance of the evidence, the existence of any of the grounds for relief"].)

## DISPOSITION

The order denying the section 1473.7 motion is reversed. The matter is remanded to the superior court with directions to grant the motion and vacate the conviction.


DATO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


AARON, J.